STATE EX REL. PATRICK GILLIS v. HARRY F. GOODRICH.[1]

No. 30,767.

December 13, 1935.

*Kerr & O'Neill,* for appellant.
*John L. Connolly* and *Hilary J. Flynn,* for respondent.

STONE, JUSTICE.

The powers of the city comptroller of the city of St. Paul are in question. The case comes here on appeal by relator from a judgment quashing an alternative writ of *mandamus.* *Mandamus* was sought for the purpose of compelling the comptroller to transmit to the city council, as his own, the estimate of the commissioner of public safety relating to the bureau of fire protection, hereinafter called the fire department. The comptroller had transmitted to the council his own estimate of the needs of that department which would require a reduction in its personnel from the present 427 employes to 93 less than that number and which would be in-

[1]Reported in 264 N. W. 234.

sufficient to pay the present salaries of the chief, assistant chief, and ten district chiefs of that department. The comptroller made this estimate on the theory that under the provisions of the charter he may investigate and determine the amount which, in his opinion, will be required to operate the various departments of the city during the ensuing fiscal year, which commences on the first day of January, and transmit the result to the council as his estimate under § 200 of the charter. The relator contends that the comptroller has no such power, but that he can only "transmit" to the council, in a consolidated report, the estimates of the various heads of departments.

The city government of St. Paul is unique in that its six elective commissioners and mayor constitute the city council. The mayor assigns the commissioners as administrative heads of the several departments of city government, among the latter being that of public safety, which includes the bureaus of police and fire protection. The council has the power of appropriation and the mayor that of veto, which may be overridden. The legislative and the executive powers of the city are thus put in the same men. So all preconceptions against such amalgamation of executive and legislative power must be put aside in the consideration of this case. We have no constitutional bar to such amalgamation.

The argument for relator is that generally the comptroller has not the power he has sought to exercise in this case, and that, in any event, after the council by ordinance has prescribed the personnel both as to number and classes of a given department, and fixed the salaries of its officers, the comptroller has no power in respect to the budget which enables him so to reduce in any year the money available for that department as to make it impossible to pay the current rate of compensation to all of the personnel, including the officers, or so as to require a reduction in personnel. That argument is deficient in factual basis in that the only ordinance pleaded by relator (No. 5553, § 5, approved February 3, 1921) provides, as to the organization of the bureau of fire protection, that it "shall be composed of not to exceed the following persons and classes of persons and they shall receive not to exceed the com-

pensation set opposite their respective classes." Then follows a schedule of the various officers and employes, giving their number and rates of pay. It is thus apparent that all the ordinance does is to fix both as to "persons and classes of persons" the maximums for their number and compensation. There is nothing in the ordinance which as matter of city law prevents the comptroller from reducing the total outlay if otherwise he has such power. We think he has for the reasons we shall now attempt to state.

Section 200 of the city charter is the one which more than any other prescribes the functions of the comptroller. In the main it reads as follows:

"BUDGET—PUBLIC EXPENDITURE.—Sec. 200. *It shall be the duty of the comptroller not later than August 15 of each year to transmit to the city council detailed estimates in writing of the expenses of the city for the next succeeding fiscal year, and of the revenue necessary to meet said expenses.* Said comptroller shall have full power and authority to require from each head of an administrative department of the City of St. Paul or other person in control of expenditures, specific estimates, in such form as said comptroller may prescribe, of the expenses of his department for the next succeeding fiscal year, the expenditures of the department for the six months immediately preceding June 30 next preceding, and for the last preceding fiscal year. Said estimates shall be placed in the hands of the comptroller prior to August 1, of each year. Said estimates shall be so itemized as to show clearly the amounts to be raised for each purpose necessary to carry on the business of the city. At the same time as presenting said estimates of expenditures, the comptroller shall also submit estimates of probable revenue from taxation, probable rate of direct property taxes necessary, and probable amount of revenue to be received by the city from sources other than direct taxation for the next succeeding fiscal year.

"In said report of budget estimates the comptroller shall divide said estimates into the following funds:

"* * *." (Italics supplied.)

In construing that language, if there is ambiguity, and there appears to be, we must look to the whole instrument for such aid as it may afford.

It is elementary that in solving such a question the whole document, be it constitution, statute or charter, should be considered. It is significant that the comptroller is one of the elective officers of St. Paul, paid as much (§ 45) as the mayor ($5,000), and more than the commissioners ($4,500). He is elected for a two-year term, subject to recall, as are also the mayor and commissioners.

It is passing strange that, if the intention were to make him in financial matters a mere speaking tube for others, he has a larger salary than those for whose views he is a mere transmitter, and that, as a mere accountant or supervising bookkeeper, he should be made elective. If the argument for relator is sound, he is the servant of the council with no independent function, except as to mechanics of accounting. One can but wonder why, if that were the design, the commissioners were not given the right by appointment to select their own servant.

Repeatedly, the charter uses the words "report" and "estimate" as synonymous. If the relator's view is correct, the comptroller's report or estimate is not his at all. It becomes a mere copy and consolidation of the reports or estimates of the commissioners. How glaringly inconsistent with that view is the fact that in at least five instances the charter refers not to any emanation from the commissioners but to the "estimate" or "report" of the comptroller.

In addition to the portion of § 200 quoted above, subd. 31 thereof, dealing with the "general fund," requires that it should be "subdivided in said report and estimates of said comptroller and specific amounts therein shall be provided for specific purposes." Under § 202, it is the "comptroller's report" which is to be published and on which public hearings are to be had. In § 203 it is the comptroller's "estimates" which are mentioned specifically three times as those which the council "shall follow closely"; which it shall not increase by more than ten per cent; and the aggregate of which it cannot increase by more than three per cent.

The language of § 203 is that:

"In determining said expenditures said council shall not increase by more than ten per cent any fund beyond the estimates of said comptroller, and it shall not increase the aggregate of all appropriations more than three per cent above the estimates of said comptroller."

The argument for relator is that the comptroller's only function under § 200 is to transmit the estimates of the commissioners to the council rather than to make any independent budget estimate of his own. Were we to adopt that argument we would have to rewrite the language just quoted so as to read as follows:

"In determining said expenditures said council shall not increase by more than ten per cent any fund beyond the estimates of said commissioners, and it shall not increase the aggregate of all appropriations more than three per cent above the estimates of said commissioners; that is, the commissioners sitting in council may review their own estimates and alter them within the limits stated."

In § 210, it is the "comptroller's report of city expenditures" that is mentioned and in respect to which certain inclusions are required to be made by him. This section deals with miscellaneous receipts, and the recommendations called for as to apportionment of such income are his recommendations and not those of any commissioner. In this important section neither the mayor nor any commissioner is once mentioned, and yet its principal subject matter is the appropriation of public moneys.

By § 208, the unanimous action of the council is required to transfer unexpended portions of budget funds. Again, unanimous action of council is not effective, even when approved by the mayor. It must be countersigned by the comptroller.

Approach to the main problem is not complete without consideration of § 206, which authorizes "emergency appropriations" "in the event of destruction of or injury to public buildings" by calamity. Such appropriations may be made only by unanimous vote of the council. With their authority, money may be borrowed "by the

mayor and comptroller." It is astounding, indeed, if the comptroller is no more than a supervising accountant, that this section requires "all acts of the council" thereunder to "be approved by the mayor and the comptroller by signing and countersigning the ordinance or ordinances, resolution or resolutions by which such action is taken, and if such ordinance or ordinances, resolution or resolutions are not so signed and countersigned, they shall be void and of no effect."

Unavailing are nice distinctions between the words "transmit," "submit," and "present," or between "estimate" and "report." Section 200 is not the only portion of the charter presenting a piece of draftsmanship subject to criticism. There could be no better case for invoking the aid of practical construction by the executive officials who have worked under this charter, and with it, since 1914. It is unfortunate that the city's case does not include proof of that practical construction as a fact. That we must decide without that aid is not our fault. Of that practical construction, if any, we cannot take judicial notice. It should have been but was not proved by evidence.

We must treat it, then, as a mere question of literal meaning of a written instrument. In the light to be had from other provisions of the charter, the construction wanted by relator would render almost meaningless the first sentence, italicized in our quotation, of § 200. That sentence could be stricken and the residue remain a complete workable mandate. There is no more sensible rule of interpretation than the one requiring that, if possible, meaning be given every portion of a legal document. That rule would be violated pro tanto the effect abstracted from the very first and important sentence of § 200.

The funds into which the comptroller is required in his "said report of budget estimates" to "divide" such estimates are 31 in number. Among these the seventh, eighth, and ninth are significant. They are, respectively, "police fund," "fire fund," and "health fund." There follows this declaration:

"The commissioner of public safety shall apportion to these three funds in submitting estimates to the comptroller, such expenses of

his office as are not properly chargeable exclusively to either the police fund, the fire fund or the health fund."

The three funds are all administered by the commissioner of public safety. In respect thereto (aside from his executive power of disbursement governed by other sections), he is given, expressly, only the limited power to "apportion" the designated "expenses." If he has the plenary power over his departmental budget which relator contends, why this express grant of power to apportion certain expenses between his own three funds? We must not make over that much more of § 200 into meaningless surplusage. It will have real meaning, plain purpose will be assigned it, and sense given the whole only by deciding that, as § 200 declares, "the comptroller shall divide said estimates" between the designated funds, subject, in the case of three of them (for police, fire, and health purposes), to the power of the commissioner of public safety to apportion the indicated expenses.

The lapse of time between August 1, before which the commissioners' estimates must be submitted to the comptroller, and August 15, when he must transmit to the council his own "estimates," whatever the latter may be, has, it seems to us, little or no relevance. The comptroller is in constant daily touch with each department. He keeps "controlling accounts with every department." § 68. In the city treasury, after the close of business each day, he checks "all the receipts and disbursements of such day." § 79. His own estimates are doubtless complete, at least tentatively, before August 1.

Our conclusion is that the comptroller of St. Paul was intended to be, ex officio, the budget commissioner, with the power to limit expenditures of any department, subject to the indicated review by the council.

Were this a case where by a standing ordinance certain expenditures were mandatorily required, our conclusion as to result might be otherwise. But where, as here, we have an ordinance fixing only maximums beyond which the designated department shall not go, in number or personnel, or their compensation, we hold that, for

the reasons stated, the comptroller has the power to do what he has done by his own budget estimates in this case. He is an elective officer and his acts subject to review by the electors at the general city election every two years. Beyond that he is subject to a recall election, as prescribed by the charter. As far as his action is discretionary, it is his discretion that must be exercised, and the only review to which it is subject is that of the political nature just mentioned.

It follows that the judgment must be and is affirmed.

LORING, JUSTICE (dissenting).

In my opinion the majority have in effect amended the charter of St. Paul by judicial interpretation. I therefore dissent. We are not concerned here with the desirability of conferring upon the comptroller the powers of a board of estimate. We are concerned solely with the question of whether or not the charter confers such powers. Nor are we concerned with the question whether the charter has made him solely a "bookkeeping" officer or has in instances other than here involved expressly endowed him with the exercise of discretion. The sole question here is whether he has the powers of a board of estimate to limit the legislative power in making appropriations.

Section 36 of article 4 of our constitution authorizes cities to adopt home rule charters, but requires a mayor or chief magistrate and a legislative body of one or two houses.

The power to appropriate is normally a legislative function, and by § 126 of the charter the power of appropriation is conferred upon the council, which is given full management and full control of the property and finances of the city, subject to the provisions of the charter, as well as to enact governmental and administrative ordinances for the good government of the city and the protection of its property, including the prevention and extinguishment of fires.

Under its charter authority the council has set up by ordinance the organization of the fire department, at first limiting the total number of employes to 600 and later, after the adoption of motor-

ized equipment, reducing the number to those who might be employed within the discretion of the commissioner. There are now approximately 427 employes in that department, all of whom were duly appointed to their respective positions by various commissioners of public safety. Their compensation is fixed by ordinance, and that of the employes aggregates $689,669 annually and that of the chief, assistant chief, and ten district chiefs aggregates $32,896 annually. The comptroller seeks to reduce the amount of fire fighters' pay to $546,386 and that of the chief and subordinate chiefs to $26,000. The respective items are therefore reduced below the present pay, as fixed by ordinance, by the sum of $143,283 for the employes and by $6,896 in the case of the chiefs.

Chapter VI of the charter prescribes in much detail the general powers and authority of the comptroller. They are important. He is required to keep controlling accounts with every department and bureau of the city government, to prepare forms for their use, and to keep books of account which will show the indebtedness and financial condition of the city. With the approval of the council he prescribes a system of documents and reports necessary for the correct record of all transactions, and he has access to all departments for the purpose of insuring that the books and records of the department be properly kept. Annually he must make an exhaustive examination of the departments and report thereon to the council.

Chapter XIII relates to public expenditures and to the preparation of estimates or a budget. Section 200 of c. XIII, as far as relates to the question presented, is set out in the majority opinion. I take the requirements chronologically. Prior to August 1 of each year each head of an administrative department or other person in control of expenditures is required to place in the hands of the comptroller specific estimates, on forms prescribed by the comptroller, of the expenses of his department for the next succeeding fiscal year; also the expenditures for the first six months of the current year and for the last preceding fiscal year. These estimates are to be so itemized as to show clearly the amounts to be raised for each purpose necessary to carry on the business of the city.

Section 200 provides in part:

"It shall be the duty of the comptroller not later than August 15 of each year to transmit to the city council detailed estimates in writing of the expenses of the city for the next succeeding fiscal year, and the revenue necessary to meet said expenses."

It then provides the method by which he shall obtain these estimates as above related, and after such provision prescribes:

"At the same time as presenting *said* estimates of expenditures, the comptroller shall also submit estimates of probable revenue from taxation."

Nowhere in the charter is it provided that the comptroller shall investigate, fix, and determine what, in his opinion, the city shall require for the ensuing fiscal year. If he has any such power it must be implied from the provisions of § 200, *et seq.*

It will be noted that three times in the latter part of the main body of § 200 the estimates referred to are designated as "said estimates." Without question the first "said estimates" refers to those that are, by the administrative heads, to be placed in the comptroller's hands prior to August 1. Immediately following this requirement comes the sentence:

"*Said estimates* shall be so itemized as to show clearly the amounts to be raised for each purpose necessary to carry on the business of the city."

Then follows the sentence:

"At the same time as presenting *said estimates* of expenditures, the comptroller shall also submit estimates of probable revenue from taxation."

Quite obviously "said estimates" in each of the three uses of the phrase refers to the same estimates. The phrase appears in three consecutive sentences; and, as above stated, there can be no question but that the first phrase "said estimates" refers to those made by the heads of the administrative departments and by them given to the comptroller prior to August 1. If the last "said estimates"

refers to the same estimates as the first similar phrase, the estimates to be transmitted are the department estimates. The language is plain, and I can see no other possible inference.

In the short period between August 1 and August 15 it is the comptroller's duty to consolidate these estimates and divide or classify them into 31 distinct funds which the charter, in § 200, requires to be set up in the accounting system. If his own estimates are ready by August 1, as intimated by the majority, then why are the commissioners required to submit theirs? It is not without significance that § 200 refers to the matter transmitted to the council as *"report* of budget estimates." Nor is it without significance that § 200 requires the comptroller to "transmit" this "report of estimates." The primary meaning of this word "transmit" is "to hand or send across." The Century dictionary defines it as follows: "1. To send over, onward, or along; hand along or down; transfer; communicate; as, to *transmit* a letter or a memorial; to *transmit* despatches. 2. To suffer to pass through; conduct." If the framers of the charter had intended that the comptroller was to originate the estimates, it is likely they would have used the word "submit" as they did in the case of the estimates of probable revenue which originate with that officer. "Submit" is commonly used in a reflexive sense which makes it appropriate for use in connection with matter originating with the subject. If the estimates presented to the comptroller by the various department heads are the ones that are to be consolidated into a report and classified, as required, and then transmitted to the council as the comptroller's report, the framers of the charter have used apt language for that purpose. We may fairly assume that they were familiar with the English language and not likely to create confusion by the ill-advised selection of words.

But all this aside, we may also fairly assume that the framers of the charter were a selected group of intelligent persons; and if they intended that the comptroller should have such extraordinary and unusual powers as those now claimed for him, "it is passing strange" and "astounding indeed" that they should have left such powers to implication and that they did not say in so many words

that the comptroller was to investigate, fix, and determine what, in his opinion, was the sum necessary to operate the city's various departments for the ensuing year, as, for illustration, the language contained in chapter 15 of the Minneapolis city charter which provides for a board with numerous members with power to "fix and determine" maximum expenditures and tax rates. But no such language appears at any place in this charter. Can it be that the mental processes of the framers of the charter were so crude that they did not know the meaning of common English words and failed to say what obviously they should have said if they intended to confer such vital powers? Elsewhere in the charter where they conferred extraordinary powers, not usually given an accounting officer, they were careful to do so in express terms, as in §§ 206, 208.

In § 202 of that instrument there is a requirement that upon receipt of the "comptroller's report" the council shall have it published and hold public hearings, at which all residents of the city may be heard in reference to any of the estimates or any item thereof. If the comptroller was to have the power to limit appropriations, is it not strange that the public was given no hearing before him but only before the council after the comptroller had fixed limits? After such hearings and not later than December 15, the council is required by ordinance adopted by four-sevenths vote to fix the amount of expenditures of each department in dollars, and in fixing such expenditures to specify from what fund they shall be taken and to make appropriations in fullest practicable detail. Apparently as a check upon public demand at such hearings § 203 provides:

"In so fixing expenditures the council shall follow closely as to items the estimates of the city comptroller. In determining such expenditures said council shall not increase by more than ten per cent any fund beyond the estimates of said comptroller, and it shall not increase the aggregate of all appropriations more than three per cent above the estimates of said comptroller."

Obviously, the estimates referred to in § 203 are the estimates referred to in § 200, and their origin is not changed by the subsequent

reference to them as the "comptroller's estimates." Obviously, too, it was more convenient so to refer to them since they came not only from all the commissioners but from any "other person in control of expenditures." Can we say because the "report of budget estimates" prepared as required in § 200 is referred to as the comptroller's report or comptroller's estimates that by implication he is authorized to investigate and determine what, in his opinion, is required to run the city for the ensuing year and that the council is limited thereby? Is extraordinary and unusual power to be implied from the mere use of the possessive case in § 203? Much more powerful in favor of the relator is the contrary implication naturally to be drawn from failure to provide for public hearings before the comptroller and from the brevity of the time (two weeks) during which the estimates are in his hands, and the length of time (four months) while they are in the hands of the council and before the public for consideration. If the framers of the charter had intended that the comptroller, after he becomes informed of the department estimates, is to carefully go into the affairs of the six departments and other expending agencies, and exercise his judgment and discretion as to the needs of each department, it is "passing strange" that they did not provide for public hearings and give him more than two weeks for this large and important work, whereas a mere consolidation and classification could undoubtedly be performed within that period. If his salary is based upon his work or discretion in originating a budget as claimed by the majority, then two weeks is a remarkably short time in which to earn it.

I think it is a fair implication from § 36 of art. 4 of our constitution that legislative functions must be lodged in the "legislative body of either one or two houses." The power of appropriation is essentially a legislative power, normally lodged in the legislative branch or body empowered to govern a municipality. It is not normally an administrative or executive power. When the executive power is exercised by way of veto the executive is then acting as a part of the legislative process. Smiley v. Holm, 285 U. S. 355, 52 S. Ct. 397, 76 L. ed. 795. Not only is the power of appropriation essentially legislative, but it is specifically conferred upon the city

council by the charter of the city of St. Paul, and I cannot believe that so radical a check upon that power so specifically conferred, by which control of appropriations would be lodged in the discretion of a single administrative accounting officer, elected though he may have been, was left to implication. Even the veto power conferred only upon the highest executive officer of a municipality, state, or nation is subject to be overridden by a sufficient majority of the legislative branch. By implication only the majority think this minor city officer may, in advance, veto without possibility of legislative review even by a unanimous council. Is not this also "passing strange"?

The majority seem to attach some importance to the fact that the comptroller is an elective officer and that there is some implication derived from that fact. So are the state auditor and state treasurer elective officers, and they draw salaries comparable to that of the governor, but from that fact alone no one has ever thought that any implied powers or responsibilities were cast upon them. The comptroller-general of the United States draws a salary much larger than that of any congressman and holds his office for 15 years, and yet it has never been suggested that for that reason he might have any implied power to originate a budget or otherwise. Any power outside of the normal duties of accounting officers are specifically and expressly conferred upon the officers mentioned, as such powers are expressly conferred by §§ 206-208. Nor can I see any implication to be derived from bookkeeping arrangements by the apportionment of overhead expense to the police, fire, and health funds in the classification under the latter part of § 200.

I think the implications relied upon by the majority are altogether too tenuous upon which to hang so extraordinary, extensive, and unusual powers for a single accounting officer. Nor do I think that the plain language of the charter may be so construed. Section 200 is, to my mind, in no need of interpretation or construction. Had it been arranged in chronological order its meaning would be plain enough. Certainly, by the obviously plain construction contended for by relator the first sentence is not rendered meaningless. Even if we are to assume, as the record fails to show, that the comp-

troller of the city of St. Paul has construed the charter as giving him such power for many years last past, I can see no room for construction. Practical construction is not binding upon the courts and is only a canon to be applied to ascertain the real intent of the framers of the charter. State ex rel. Bd. of Ed. v. Erickson, 190 Minn. 216, 251 N. W. 519. Practical construction may not be accepted when it is plainly a wrong interpretation.

"Were the courts, simply because of its extended duration, obliged to follow an erroneous practical construction of a plain provision of it, a constitution could be amended without consulting the people. Nothing is farther from the basic theory of our government." State ex rel. University of Minnesota v. Chase, 175 Minn. 259, 273, 220 N. W. 951, 957.

Here we are dealing with no vested rights based on that kind of construction. To permit city officials to invoke their own actions as. a practical construction of their powers "might result disastrously." Sommers v. City of St. Paul, 183 Minn. 545, 549, 237 N. W. 427.

In the case at bar we have an ordinance, properly authorized by the city charter, organizing the fire department, stating what it shall consist of in the way of officers and employes and fixing their salaries. The number of employes is by such ordinance placed at the discretion of the commissioner, who naturally, more than anyone else, knows the technical requirements of the art of fire fighting. Can it be that the charter intended to confer upon a single administrative accounting officer, who naturally knows little of fire fighting requirements, the power, without a public hearing, and not subject to legislative review, to, in effect, repeal or modify the terms of such an ordinance solemnly adopted by the legislative body? If that were the case there would be apt, express language in the charter conferring such power. Certainly such power cannot be implied from the language of the charter here before us. Even if he has budgetary discretion, I do not think it goes to the extent of changing the ordinance.

DEVANEY, CHIEF JUSTICE, and HOLT, JUSTICE (dissenting). We concur in the dissent.

UPON APPLICATION FOR REARGUMENT.

On January 10, 1936, the following opinion was filed:

STONE, JUSTICE.

The relator's petition for rehearing is denied. But we must say, in fairness to counsel, that the "factual basis" of the argument for relator is broader than the opinion indicates. In addition to ordinance No. 5553, § 5, we should have mentioned § 367 of the charter and ordinance No. 3250½, which became effective October 21, 1922. Section 367 of the charter designates the commissioner of public safety as *ex officio* fire marshal and head of the bureau of fire protection.

The ordinance No. 3250½, as far as now material, declares that "appointing officers have the authority to appoint and employ, in accordance with the titles and grades enumerated in §§ 6, 7, and 8 hereof, such number of persons as in their judgment may be necessary for the proper transaction of the business of their respective departments." Section 367 is of no help to relator because it is expressly subject to the other provisions of the charter, including those which give the comptroller his powers. The ordinance No. 3250½ is general in its terms and certainly not intended to modify the powers of the comptroller in respect to the budget of any department. That is true also of ordinance No. 6446, relating to civil service rules and classifications.