## NATHANIEL A. EVANS v. CITY OF ST. PAUL.[1]

January 16, 1942.

No. 32,928.

*Samuel Lipschultz* and *Melvin L. Lipschultz,* for appellant.

*Harry W. Oehler,* Corporation Counsel, and *Hilary J. Flynn,* Assistant Corporation Counsel, for respondent.

JULIUS J. OLSON, JUSTICE.

Plaintiff's action to recover "back pay" benefits "as a city fire fighter" under the provisions of § 52 of the St. Paul charter met with an adverse verdict. His blended motion for judgment or a new trial was denied. Judgment was entered, and he appeals.

[1]Reported in 2 N. W. (2d) 35.

. The portion of the charter section upon which plaintiff relies provides:

"In case of disability through * * * sickness * * * in case of firemen, such firemen shall, notwithstanding such sickness * * *, receive his salary, less the amount paid a substitute, *if any substitute is employed,* for a period not exceeding 12 months." (Italics supplied.)

Two causes of action are pleaded. The first involves "back pay" from February 1, 1938, to January 15, 1939, wherein $1,389.95 is claimed, being the difference between $1,782.50, which plaintiff would have earned if drawing full pay, less $392.55, the amount received by him after monthly deductions from his salary for substitutes. The second cause is for the period from January 1 to and including May 31, 1936, for which recovery of $858 is sought upon a like basis.

The record establishes the following facts: From January 1, 1918, until January 31, 1938, plaintiff was in the continuous service of defendant as a member of its fire department, except that from August 31, 1918, until the spring of 1919 he was absent on leave, duly granted, while he was in military service in World War No. 1. In 1924 he was promoted to the position of engineer of company 9, consisting of colored men only.

Some time prior to January 31, 1938, he was suffering from glaucoma in both eyes to such an extent as to be almost totally blind in one eye and nearly so in the other. This ailment was not caused by, nor was it the result of, any injury received while in the service of the city. Some time prior to this date, defendant, having learned of plaintiff's condition, notified him that he could no longer continue as a member of the fire department. Accordingly, he was placed on sick leave as provided by § 52. From then on until January 15, 1939, he was carried on defendant's payroll as a disabled engineer of his company. The amount of his compensation was $155 per month, less authorized deductions made

for a substitute. In substance and effect, the other cause of action is similarly founded.

Plaintiff's claim has for its foundation—

"that in truth and in fact defendant did not employ a substitute in place of the plaintiff during any part of the period of time aforementioned, and that the sums paid by the defendant to the plaintiff during the entire period of time * * * was not in accordance with the charter provision hereinbefore referred to, and that the deductions made each month by the defendant from the plaintiff's pay were unauthorized" and "in clear violation of plaintiff's rights under the charter provision hereinbefore referred to."

So the issue presented, as gathered from the facts, is largely, if not wholly, one of law, and its solution depends upon the interpretation (if interpretation is needed and permissible) to be given the charter provisions and the civil service rules and regulations applicable to plaintiff, who concededly was within the classified service of the city.

In State ex rel. Gillis v. Goodrich, 195 Minn. 644, 645, 264 N. W. 234, 235, the city government of St. Paul is characterized as "unique in that its six elective commissioners and mayor constitute the city council. The mayor assigns the commissioners as administration heads of the several departments of city government, among the latter being that of public safety, which includes the bureaus of police and fire protection." The issue in that case related to the powers of the comptroller. We reached the conclusion that he (195 Minn. 650, 264 N. W. 237) "was intended to be, ex officio, the budget commissioner, with the power to limit expenditures of any department," subject to review by the city council as permitted by the charter and as stated in that opinion. The importance of the comptroller's power as there determined will be apparent here as we enter upon the phase having to do with retrenchment when and as ordered by the comptroller in conducting the affairs of the city. By reason thereof, it became necessary from time to time to reduce the personnel of various departments, among them the bureau of fire protection. Between 1922 and the time of trial, it

had become necessary to reduce the number of these employes to between 160 and 170 men. During the early part of 1935, the chief of the fire bureau ascertained that the amount fixed by the budget would not permit the continued employment of the number of men then engaged in that branch of the service. To carry on within budget limitations, he found it necessary to lay off at least eight firemen, and this he did on March 31, 1935. It is clear that there is need for capable and efficiently trained men who can be called into active service to take the places of those who may become incapacitated in the active force on account of sickness, accidental injuries, and the like; and so the chief named, as substitutes, for active duty as of April 1, these eight men who had been retired from the active duty list on March 31, 1935. On the new list they were named in the order of their seniority. As need arose, he would "requisition" the civil service bureau, on the form prescribed for regular appointments, but would indicate thereon that the appointee was "to perform substitute fire fighter work as needed and as assigned," or as "fire fighter on substitute duty." When and as needed, these substitutes were appointed to the regular force, and in their places on the substitute list would be placed the names of other men who had passed the physical and mental examinations of the civil service bureau requisite to their placement on the eligible list in the order of their respective priorities.

As we have seen, the eight men so laid off were at once placed upon the substitute list. With full knowledge of the facts, they accepted their reëmployment and received their pay from the "payroll for substitutes" in place of the "regular" payrolls. The department records show what sick men the substitutes represented. The regulars so off duty received the difference in salary between their regular pay and that paid the substitutes. All were treated alike, plaintiff with the rest of them.

No one can doubt that by this system the city was better served than by any other plan theretofore devised. Protection was afforded by having the services of qualified men always available. It

was but the application of good and sensible business administration. Plaintiff does not assail the *system* as such. Rather and only, his complaint goes to what he thinks are controlling rules and regulations adopted to safeguard the rights of St. Paul's civil service employes. And he points to the following provisions of the charter and the rules and regulations of the civil service bureau as conclusively establishing his right to "back pay":

By virtue of § 101 of the charter, the commissioner of civil service was "authorized and empowered to frame and submit to the council for its approval rules and regulations for the Classified Service." In conformity therewith, from time to time, such rules and regulations were duly adopted. (See St. Paul Civil Service Rules and Classification, 1933 and 1938.) In the fire department bureau there were "regular appointees." These included all those who were not within the "temporary," "provisional," or "emergency" appointments. Our attention has been directed to §§ 31, 32, and 33 of the 1933 rules and regulations. Under § 31 the commissioner—

"may grant authority to the officer or body making such requisition to make provisional appointment to fill said position, such appointment to remain in force not longer than ten days after certification is made from an appropriate eligible list. Within sixty days after the granting of such provisional appointment permit, the Commissioner shall, if practicable, schedule an examination for such position."

By § 32, provision is made for "temporary" employment. It provides that upon the request of the appointing officer the commissioner may "grant authority to the said officer to make temporary appointment to fill a vacancy in an employment of an essentially temporary and transitory nature." That section was later amended (1938 rules, p. 47) to read as follows:

"No person shall receive more than two temporary employments in any one calendar year, nor shall the second temporary employment begin within thirty days of the termination of any preceding temporary or provisional employment."

By § 33, provision is made for "emergency" employment. Under it, "employing officers may employ persons without requisition to fill positions in any class of service; provided, however, that such employment shall not continue more than five days without the approval of the Civil Service Bureau."

Plaintiff points to all of these as positive proof that "all the substitutes" referred to as being plaintiff's substitutes "were illegally employed," since in none of the quoted sections of the regulations is provision made for the appointment of "substitutes." Therefore, he concludes, the provision in § 52, in which he places abiding faith, has not been complied with, and hence "back pay" follows as a matter of course. And he repeatedly points to the fact that as to engine company No. 9, to which he was assigned, no substitute "performed any work" at said station.

The practice of the department was to place in active service a substitute for a regular fireman who had become ill, giving the latter 30 days' full pay and thereafter during his illness the difference between his regular pay and that of his substitutes. And this was done in plaintiff's case. A substitute so assigned to take the place of a sick man would be directed to render service when and where the need existed. The substitutes really constituted a reserve force to be placed wherever the fire chief deemed their presence needed. This practice, so defendant maintains, was permissible and proper under § 351 of the charter, which provides "that. nothing therein [ordinances relating to civil service] shall prevent the said commissioner [of public safety] from using the officers and employes of one bureau temporarily for work in another, or the performance of work connected with the city business which the said commissioner may direct them to perform." And plaintiff concedes as much, for at pages 111 and 112 of his brief he says:

"That the employes of one bureau may *temporarily* be used in another is too clear to admit of argument. And it would no doubt follow that a fire fighter could be transferred from one unit to another—temporarily or *permanently*."

■ That plaintiff rendered no service during the times for which he now seeks recovery is conceded. Nor is there any doubt that his designated substitutes were paid out of the money that otherwise would have gone to him if he had remained in service. If instead of a "substitute" plaintiff's work had been done by a "temporary," "provisional," or "emergency" employe, would his claim to "back pay" be tenable? Of what importance, then, is the mere name given the one who took his place? We should look to the substance rather than to the label, since ascertainment of the legislative intent is the aim, 6 Dunnell, Dig. & Supp. § 8940; Spokely v. Haaven, 183 Minn. 467, 469, 237 N. W. 11; and the construction to be adopted and used must be reasonable—such as the chosen language "will reasonably bear." "Questions involving government must not be determined along technical lines," but rather upon "broad and practical considerations." *Id.* § 8939. By so doing, no doubt remains as to the propriety of and the sound foundation for the verdict. After all, the object to be attained and the means to be applied to reach that objective are to be considered in our construction of the pertinent charter provisions. State ex rel. Hilton v. City of Brookside, 161 Minn. 171, 173, 174, 201 N. W. 139; 6 Dunnell, Dig. & Supp. § 8962, and cases under note 28. The expressed intent of § 351 of the charter, *i. e.*, to "secure the best results from his [commissioner of safety] subordinates," is of compelling force. *Cf.* Judd v. Landin, 211 Minn. 465, 1 N. W. (2d) 861. Important, too, is administrative interpretation tested by many years of practical and satisfactory experience. 6 Dunnell, Dig. & Supp. § 8952, and cases under note 70. Upon the record, no other result than that reached could be sustained.

Other errors assigned have been considered, but we do not find them deserving of special treatment.

The judgment is affirmed.